IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION



**EOD**

03/16/2026

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| JONATHAN M. CORPUZ, JR. and | § | |
| ROBIN M. CORPUZ | § | Case No. 23-10471 |
| | § | |
| Debtors | § | Chapter 7 |

| | | |
|---|---|---|
| RICKY PAUL ABSHIRE, | § | |
| BARRY BARNETTE, | § | |
| MICHELLE BARNETTE, | § | |
| EARL GREEN, CORY MITCHELL, | § | |
| JENNIE MITCHELL, | § | |
| JAIME ABSHIRE, | § | |
| KRISTI ABSHIRE, and | § | |
| LARRY CORNETT | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| v. | § | Adversary No. 24-1001 |
| | § | |
| JONATHAN M. CORPUZ, JR. and | § | |
| ROBIN M. CORPUZ | § | |
| | § | |
| Defendants | § | |

## **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The Court issues these findings of fact and conclusions of law after conducting trial in the above adversary proceeding.  Plaintiffs each seek to except from discharge alleged debts owed them by Jonathan M. Corpuz, Jr. and/or Robin M. Corpuz arising from construction projects which each of the Plaintiffs hired Defendants to perform, pursuant to 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(4).  All parties appeared through counsel at trial.

1

These findings dispose of all remaining issues pending before the Court in the above adversary regarding Plaintiffs' Original Complaints[1] against Jonathan M. Corpuz, Jr. and Robin M. Corpuz pursuant to 11 U.S.C §§ 523(a)(2)(A) and 523(a)(4).  These findings and conclusions constitute the Court's findings of fact and conclusions of law and fact pursuant to Fed. R. Civ. P. 52, made applicable to adversary proceedings by Fed. R. Bankr. P. 7052.  Where appropriate, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact.

## I.  **Findings of Fact**

### *Trial Generally*

1. The Court entered its *Joint Pre-Trial Order*[2] on August 20, 2025.

2. Trial in this proceeding began on August 25, 2025.[3]

3. Plaintiff, Ricky Abshire, as the representative of the estate of Audrey Abshire, admitted into evidence Exhibits R. Abshire 1, 2, 3, 4, 5, 6, 6a, 7, 9, 10, 11, and 12.

4. Plaintiffs, Barry and Michelle Barnette, admitted into evidence Exhibits Barnett 1, 2, 3, 4, 5, 7, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, and 23.

5. Plaintiffs, Jaime and Kristi Abshire, admitted into evidence Exhibits J&K Abshire 1, 2a, 3, 4, 5, 7, 8, 9, 10b, 10c, 10d, 10h, 10k, 10m, 10n, 10r, 10s, 10u, 10w, 10z, 11, 12, 13, 14, and 15.

6. Plaintiffs, Cory and Jennie Mitchell, admitted into evidence Exhibits Barnett 1, 2, 3f, 3g, 3h, 4a through 4n, 5a through 5e, 6a and 6b, 7a

---

[1] *See* ECF No. 1 in Adv. Nos. 24-1001, Adv. No. 24-1002, and Adv. No. 24-1003.  There are three complaints in this proceeding because Adv. Nos. 24-1002, and Adv. No. 24-1003 were consolidated into Adv. No. 24-1001 by agreement.  *See* Adv. No. 24-1001, ECF No. 23.

[2] ECF No. 40.

[3] ECF No. 31.

through 7d, 8, 9, 10a through 10e, 11, 12a through 12e, 13, 14a and 14b, 15, 16, 17, 18, and 19.

7.    Plaintiff, Earl Green, admitted into evidence Exhibits Green 1 through Green 28, including sub-parts.

8.    Defendants admitted Exhibits A, B, C, D, E, F, G, H, I, J, K, L, M, N, O, P, Q, R, S, T, U, and V.

9.    All other exhibits were either not offered or were not admitted.  No offer of proof was made of any excluded exhibits.

10.    The Court heard testimony from the following witnesses at trial:

   a.  Jonathan M. Corpuz, Jr.
   b.  Robin M. Corpuz
   c.  Chris Borne
   d.  Winston Droddy
   e.  Robert Green
   f.  Shelly Swanson
   g.  Glenn Duchamp
   h.  William Dinolfo
   i.  Ricky Abshire
   j.  Cory Mitchell
   k.  Michelle Barnette
   l.  Brian Melancon
   m. Barry Barnette
   n.  Jaime Abshire
   o.  Jenny Mitchell; and
   p.  Earl Green.

*Stipulated Facts[4] - As to All Parties*

11.    Defendants operated Green & Sons Construction Company ("Green & Sons") as a sole proprietorship providing residential construction and home improvement services in Texas from approximately April 2017 through November 2017.

---

[4] The parties stipulated to various facts as set forth in the *Joint* Pre-Trial Order.

12. Hurricane Harvey struck the Texas coast on August 25, 2017, causing widespread damage to residential properties and creating substantial demand for construction and repair services.

13. Defendants continued to solicit and accept new construction contracts and customer payments for approximately 60 days following Hurricane Harvey, ceasing operations in or around November 2017.

14. Defendants also operated a separate business entity known as "Arctex" during the relevant time period.

15. When Defendants took money from Plaintiffs, it was on the promise that they would perform services and buy materials for their construction projects.

*Facts Established at Trial - As to All Parties*

16. Jonathan M. Corpuz, Jr. ("Mr. Corpuz") is originally from Nederland, Texas, and was 48 years old at the time of trial. He does not have a business degree but has training in electrical work.

17. Defendants have been married for seventeen years and have six children.

18. Plaintiff, Earl Green, raised Mr. Corpuz as his own stepson, though he was never formally adopted. Robert Green is Earl Green's biological son.

19. Earl Green worked as a cabinetmaker. According to Mr. Corpuz, in 2016 Mr. Green was struggling to work as a cabinetmaker because of various health problems.

20. Arctex was created in 2016 to perform electrical work. Brian Melancon ("Mr. Melancon") worked with Mr. Corpuz at Arctex.

21. Mr. Corpuz testified he was the President and 39% owner of Arctex during the time relevant to this adversary, though only a 15% ownership interest of unknown value was included in Debtors' schedules. At least one other owner of Arctex was Mr. Melancon. Mr. Melancon is related to Mrs. Corpuz by marriage.

22. Arctex was still in operation as of the date of the trial.  Though details of the arrangement are uncertain, Mr. Corpuz testified that in 2019 all but the remaining 15% of his ownership interest in Arctex was lost because the other unnamed majority owners of Arctex voted to dilute his ownership interest. He has not received a distribution from Arctex since 2019, and claims to not know who owns Arctex now.

23. In 2017, the only income earned by Mr. Corpuz came either from Green & Sons or from Arctex, though he stated that Green & Sons "never" made any money.  Mr. Corpuz estimated he was paid $100,000.00 by Arctex in 2017.

24. Damage caused by Hurricane Harvey increased demand for construction work.  Mr. Corpuz testified that Winston Snoddy was approached by Ken Authement ("Mr. Authement"), owner of All-In Construction.  Mr. Authement's company had too much construction work to perform and began to send certain jobs to Green & Sons after its formation.

25. Mr. Corpuz had not operated a construction company before the formation of Green & Sons but had work experience in the construction industry.

26. When asked how he began the business of Green & Sons, Mr. Corpuz testified that in September to October 2017, he first looked for manpower and then materials. Certain materials, such as sheetrock, were difficult at the time to obtain. He also leased an office to use to meet customers which was located on Twin City Highway in Nederland, Texas.

27. Winston Droddy was a construction manager that Mr. Corpuz hired to work at Green & Sons.  As such, he ran Green & Sons' work crews and would meet a few times a week with Mr. Corpuz about job progress.  Mr. Droddy testified he had a foreman supervising each jobsite and was responsible for purchasing supplies for each jobsite.

28. Mr. Droddy recalled that in September and October 2017, Green & Sons had thirty to forty employees.  He sometimes used spreadsheets to try and keep track of job progress.

29. Making changes to the scope of work on construction projects affects project costs and the time needed for project completion.

30. Mr. Droddy testified that Green & Sons took on too much work after Hurricane Harvey.

31. By November 2017, Mr. Corpuz was trying to manage an organization which had grown quickly larger. He knew Green & Sons needed to reduce the number of jobs at one time so projects could be finished on time.  Mr. Corpuz failed to make this change because, according to him, Mr. and Mrs. Barnette's actions foreclosed the possibility of a workable reorganization plan.

32. Defendants, through Green & Sons, accepted payments from all Plaintiffs except Earl Green.

33. The Green & Sons Operating account was located at Five Point Credit Union.  Mrs. Corpuz was responsible for bookkeeping, but Mr. Corpuz testified only he could sign checks.  From January 1, 2017, through October 7, 2018, Green & Sons reported a net loss of $217,243.77.[5]

34. Arctex's bank account was located at First Financial Bank.

35. The accuracy of this loss and of Defendants' financial record keeping was disputed at trial.  The Court admitted into evidence further profit and loss detail, the accuracy of which was again disputed.[6]  Defendants' summary of this financial information was not persuasive.[7]

36. What is not disputed is that funds moved back and forth between the bank accounts of Green & Sons and Arctex.  Mr. Corpuz states that Green & Sons made "loans" to Arctex which were fully repaid.  He was again uncertain regarding the details of these loans.  These are reflected in Ex. Green – 3 produced by Defendants during discovery, though Mr. Corpuz did not believe its contents were accurate.  He instead thought Ex. A, a profit and loss statement for Green & Sons, is

---

[5] Ex. R. Abshire 6.

[6] Ex. R. Abshire 7.

[7] Ex. B.

more accurate. However, Ex. A. does not reflect the admitted transactions between Green & Sons and Arctex.

37. Some repayments from Arctex to Green & Sons occurred while Plaintiffs were seeking return of funds they had paid to Green & Sons for construction work. Defendants were negotiating to refund less than the full amount paid by Plaintiffs. According to Defendants' testimony, they used funds repaid by Arctex to pay subcontractors, laborers, and for materials on Green & Sons' jobs.

38. Plaintiffs were not told Green & Sons was loaning their money to Arctex. Later, in December 2017, a letter was sent to Plaintiffs informing them that Green & Sons was out of business because of unforeseen circumstances.

39. At trial Mr. Corpuz testified that Green & Sons was forced to close not because of a lack of money controls, but because of unreasonable customer demands and organizational inefficiencies. He also testified that his primary focus was on Arctex, because its jobs were more lucrative than Green & Sons.

40. Arctex paid at least $175,028.50 to Green & Sons between November 2, 2017, and December 22, 2017.[8]

41. Defendants paid some refunds to some Plaintiffs.[9] Mrs. Corpuz testified that the profit and lost statement details were accurate as to profits and losses of Green & Sons, but not as to refunds. [10]

42. Mr. Corpuz testified that the "loans" from Green & Sons to Arctex were mostly to manage Arctex's cash flow while it was waiting to be paid by its customers and were not for Arctex's payroll.

---

[8] *See* Ex. Green – 2, which Mr. Corpuz testified he did not dispute. *See also* Exs. Green – 6a, 6gb, 6c, 6d, 7a, 7b, 7c, 7d, and 7f.

[9] Ex. L.

[10] Ex. A.

7

43.   Mr. Corpuz was paid by Arctex an annual salary of approximately $100,000.00.  Mrs. Corpuz was not paid by Arctex.  Brian Melancon was also paid by Arctex.

44.   A report listing "loans" from Green & Sons to Arctex was admitted into evidence.[11]  Between January 31, 2017 and October 20, 2017, Green & Sons had loaned Arctex a total of $207,507.73.  Several of the written construction contracts signed by the Plaintiffs with Green & Sons were signed during this time frame: Barry and Michelle Barnette on August 2, 2017, Audrey Abshire on September 26, 2017, and Jaime and Kristi Abshire on September 26, 2017.

45.   Brian Melancon was the chief executive officer of Arctex, including when it received funds or loans from Green & Sons.  Mr. Melancon testified credibly that he did not want Arctex involved with Green & Sons, and that he wanted Green & Sons to be repaid by Arctex.[12]  It appears from Mr. Melancon's testimony that Arctex repaid a significant amount to Green & Sons.[13]  Mr. Melancon recalled that once a payment of $39,000.00 was paid by Arctex to Green & Sons, he believed all Green & Sons funds had been returned.

46.   Mr. Melancon testified that during the time Arctex was loaned or paid funds from Green & Sons, Arctex itself was in some financial difficulties.

47.   Neither Mr. Corpuz nor Mr. Melancon now has any direct managerial control over Arctex.

48.   Mr. Corpuz realized by the end of October 2017, that some of the work Green & Sons had accepted would or could not be completed by Green & Sons.  He blamed Mr. and Mrs. Barnette's cancellation of their contract with Green & Sons for this failure, as well as Mrs. Barnette's postings on Facebook about Green & Sons.

---

[11] Ex. Green 3.

[12] Ex. Green 4 and 5.

[13] *See* Ex. Green 2, Ex. V, and Ex. 6a, 6b, 6c, 6d.

49.   It is unclear how Mr. Corpuz came to this realization.  For example, he did not make personal assessments of, and had no personal knowledge of, the work being performed for Cory and Jennie Michell.  At trial he also blamed issues of materials or design.  Mr. Corpuz did assess Mr. and Audrey Abshire's project, which still needed sheetrock work and flooring installation.

50.   Mr. Corpuz testified that of approximately thirty jobs taken on by Green & Sons, only ten or eleven were completed.  Green & Sons abandoned Audrey Abshire's home unfinished. Mr. and Mrs. Barnette cancelled their contract with Green & Sons.  So did Cory and Jennie Michell.

51.   Green & Sons did not open separate bank accounts to keep customer construction trust funds for its various jobs separated.  Separate ledgers were kept by job, the accuracy of which is uncertain.

52.   Green & Sons ceased doing business shortly before Thanksgiving in November 2017.  Mr. Droddy recalled this happened overnight because Green & Sons simply ran out of money.

53.   Robin Corpuz has a bachelor's degree in accounting and works for a water utility company.

54.   Robin Corpuz worked for Green & Sons, and was responsible for administrative work, keeping documents, receipts, corporate filings, and bookkeeping.  She did not prepare construction contracts, testifying that Winston Droddy instead prepared them.  In at least some email correspondence, she represented herself to be the "President" of Green & Sons.

55.   Mrs. Corpuz testified she calculated revenue as funds from customers, and expenses as all expenses paid.[14]

56.   Mrs. Corpuz processed payroll and had contact with customers.  She was assisted in the office by Shelly Swanson.  She testified that all employees were paid, and that getting information to the office was

---

[14] Ex. A.

sometimes difficult. Mr. Droddy agreed employees were paid, but not on time towards the end of Green & Sons operations.

57. Mrs. Corpuz did not contradict her husband concerning the "loans" from Green & Sons to Arctex and stated there were only a few times when Green & Sons' account was overdrawn. She stated that Exhibit V was inaccurate and prepared by Brian Melancon.

58. Mrs. Corpuz initiated the Arctex transfers, using cashier's checks to document them. She said all funds transferred to Arctex were returned, and that all suppliers, employees, and subcontractors of Green & Sons were paid.

59. The memo lines of the cashier's checks used to make funds transfers to Arctex do not document which customer of Green & Sons the funds being transferred came from.

60. Mrs. Corpuz remembered November 30, 2017, as the day Green & Sons ceased doing business.

61. Mr. Corpuz was interviewed by *The Examiner*, which ran a front-page article about Green & Sons in its January 4-10, 2018 issue.[15] He testified that this article was full of inaccuracies. This article ran after Green & Sons had already ceased doing business, meaning that it was unlikely to have been the reason for Green & Sons' closure. More plausible explanations for the failure of Green & Sons are a lack of sufficient capital due to transfers to Arctex, Mr. and Mrs. Corpuz's incompetence in running a construction business, their fiscal mismanagement of that construction business, or a combination of these.

62. Regarding the article in *The Examiner*, Mrs. Barnette testified as well that it was inaccurate when it described her home as flood damaged, but that her quotes were accurate.

*Stipulated Facts - As to Ricky Abshire for the Estate of Audrey Abshire*

63. Plaintiff, Ricky Abshire, is the representative of the estate of Audrey Abshire.

---

[15] Ex. Barnette 9.

64.    Audrey Abshire entered a residential remodeling contract with Green
& Sons on September 26, 2017, for her home located at 6804 Fairway
Point Court, Port Arthur, Texas 77642. The total contract price was
$71,185.00. The period of performance was October 2, 2017, through
November 15, 2017.

65.    The remodeling of Audrey Abshire's house was made necessary due to
flooding during Hurricane Harvey which made landfall in southeast
Texas on August 25, 2017.

66.    The scope of work was as follows:

   a.  Re sheetrock/tape/float/texture walls and insulate

   b.  Replacing all base boards

   c.  Replace doors/3 2.0", 1 30", 5 32", 1 30" with mini blinds, 1 2.8"
       garage door

   d.  Replace door casing

   e.  Install laminate flooring with pad entire house without tile

   f.  Paint entire interior of house

   g.  Build and install lower kitchen cabinets and refinish uppers/Does
       not include counter tops or sink

   h.  Build and install 2-bathroom vanities, does not include counter
       tops or sinks

67.    The payment schedule in the contract with Ms. Abshire was as follows:

   a.  15% at signing of contact

   b.  25% when job starts

11

    c.  25% second week of job

    d.  25% third week of job

    e.  10% upon completion of job

68.    Audrey Abhsire paid Green & Sons $10,677.95 on September 28, 2017. These funds constituted construction trust funds under the Construction Trust Fund Act.[16]

69.    Audrey Abshire paid Green & Sons $17,796.25 on October 4, 2017. These funds constituted construction trust funds under the Construction Trust Fund Act.

70.    Audrey Abshire paid Green & Sons $17,796.75 on October 17, 2017. These funds constituted construction trust funds under the Construction Trust Fund Act.

71.    Audrey Abshire paid $17,796.25 on October 26, 2017, to Green & Sons. These funds constituted construction trust funds under the Construction Trust Fund Act.

72.    Green & Sons abandoned the work at Audrey Abshire's home when it shut down.

73.    The scope of work under the contract had not been completed.

74.    Ms. Abshire paid Andy's Remodeling $44,141.00 to complete the remodeling of her home after Green & Sons abandoned the job.

75.    On or about December 22, 2017, Defendants offered a partial refund to Ms. Abshire in the amount of $7,250.00. Ms. Abshire refused this refund as it was not the full amount she was owed.

---

[16] The "Construction Trust Fund Act" refers to Tex. Prop. Code § 162.001, et. seq.

76.   Ms. Abshire, through her counsel of record, send a demand letter to Green & Sons on January 12, 2018.

77.   Audrey Abshire died on January 29, 2019, at the age of 88 years old. She left her house to her nephew, Ricky Abshire.

78.   On September 30, 2019, Ricky Abshire, as the representative of the estate of Audrey Abshire filed a lawsuit against Corpuz Enterprises, LLC D/B/A/ Green & Sons Cabinetry & Construction and Johnathan Corpuz, Jr. and Robin Corpuz alleging Breach of Contract, Conversion, Promissory Estoppel and violations of the Deceptive Trade Practices Act, Cause No. D-204627, in the 172nd Judicial District Court of Jefferson County, Texas. There was no final judgment in this matter prior to Defendants filing for bankruptcy.

79.   Defendants filed Chapter 7 Bankruptcy on November 27, 2023, Case No. 23-10471.

80.   On March 18, 2024, Ricky Abshire, as the representative of the estate of Audrey Abshire filed an adversary proceeding; Cause No. 24-01001.

*Facts Established at Trial – As to Ricky Abshire for the Estate of Audrey Abshire*

81.   Audrey Abshire's project was one which All-In Construction, owned by Ken Authement, could not complete and so was referred or transferred to Green & Sons.

82.   Mr. Corpuz testified that all funds paid to Green & Sons by Audrey Abshire were spent on actual costs of her construction project.

83.   Mr. Corpuz testified that the job cost report admitted into evidence lists all funds spent on Audrey Abshire's construction project.[17]  The

---

[17] Ex. N; *see also* Ex. R. Abshire 9.

accuracy of this report is uncertain. [18]  For example, there is no way to verify whether costs for fuel were expended on Audrey Abshire's project.  Further, no loans of funds to or from Arctex are reflected in the report.

84.   Winston Droddy helped track job progress on Audrey Abshire's home using a spreadsheet.[19]

85.   The last work on Audrey Abshire's home was performed on November 30, 2017.

86.   Mr. Droddy stated most work done at Audrey Abshire's home was demolition, though some sheetrock and flooring was installed in one room.  Photos admitted into evidence at trial are consistent with Mr. Droddy's recollection of the work performed. [20]

### *Stipulated Facts – As to Barry and Michelle Barnette*

87.   The Barnettes entered into a residential remodeling contract with Green & Sons on August 2, 2017, for a home they had purchased located at 630 22nd Street, Beaumont, Texas, 77713. The total contract price for the scope of work was not to exceed $132,168.00 unless otherwise agreed to by both parties via the project change control procedure as outlined in the contract. The period of performance was August 2, 2017, through November 6, 2017.

88.   The scope of work is set forth in the List of Proposed Work Punch List that was an attachment to the contract.

89.   The payment schedule in the contract with the Barnettes was as follows:

---

[18] *Id.*

[19] *Id.*

[20] Ex. R. Abshire 3.

   a.  17.4% at the beginning of the job

   b.  25% when 5% remains of 1st deposit

   c.  25% when 5% remains of 2nd deposit

   d.  25% when 5% remains of 3rd deposit

   e.  10% upon completion or equal to final balance remaining

90.  The Barnettes paid Green & Sons $23,000.00 on August 3, 2017. These funds constituted construction trust funds under the Construction Trust Fund Act.

91.  The Barnettes paid Green & Sons $33,042.00 on October 27, 2017. These funds constituted construction trust funds under the Construction Trust Fund Act.

92.  On October 25, 2017, a change order was generated to include several new scope items the Barnettes wanted. On October 26, 2017, the Barnettes returned their reviewed copy of the change order with their edits that would add six new scope items including house roofing and repair of water damage in kitchen ceiling.

93.  October 26, 2017, the Barnettes received an e-mail from Green & Sons with a breakdown of expenses and issued the next draw on October 27, 2017, in the amount of $33,042.00. These funds constituted construction trust funds under the Construction Trust Fund Act.

94.  On November 14, 2017, the Barnettes cancelled the contract with Green & Sons.

95.  On December 12, 2017, counsel for the Barnettes sent a demand letter to Defendants demanding repayment of $56,000.00 and advising Defendants that the work they performed was not performed in a workmanlike manner and that Defendants had also damaged portions of the Barnettes property.

96. On December 14, 2017, the Barnettes send a demand letter to Defendants demanding repayment of $56,042.00.

97. On December 22, 2017, Defendants offered a partial refund of $7,250.00 to the Barnettes.

98. They refused to accept this refund because it was not the full amount they were owed.

99. On August 22, 2019, Barry and Michelle Barnette filed a lawsuit against Corpuz Enterprises, LLC D/B/A/ Green & Sons Cabinetry & Construction and Johnathan Corpuz, Jr. and Robin Corpuz alleging Breach of Contract, Conversion, Promissory Estoppel and violations of the Deceptive Trade Practices Act; Cause No. A-204351 in the 58th District Court of Jefferson County, Texas. There was no final judgment in this matter prior to Defendants filing for bankruptcy.

100. On March 19, 2024, Barry and Michelle Barnette filed an adversary proceeding in the underlying bankruptcy, Case No. 24-01002.

101. On July 29, 2024, the adversary proceedings of Ricky Paul Abshire, Barry and Michelle Barnette, Earl Green, Cory Mitchell, Jennie Mitchell, Jaime Abshire, Kristi Abshire and Larry Cornett were consolidated under Case No. 24-1001.

102. On April 17, 2024, a discharge order was issued for both Defendants.

*Facts Established at Trial – As to Barry and Michelle Barnette*

103. Michelle Barnette owns two daycares and has significant experience in education.

104. Barry Barnette is now retired, has a business degree from the University of Texas, and worked as a civil contractor and project manager on local and national earthworks projects.

16

105. The home the Barnettes hired Green & Sons to remodel was built in 1938 and is in the Calder Place neighborhood of Beaumont. Previously, and until completion of the remodeling project, the Barnettes lived in Port Neches, Texas.

106. Michelle Barnette testified she wanted to remodel the home, while maintaining its historic character, to move the laundry room into the house from the garage, and to add on a master bathroom, bedroom, and closet.

107. Michelle Barnette found Green & Sons through an advertisement on Facebook.

108. Michelle Barnette met with Mr. Corpuz and understood from him that Green & Sons had been in business for more than 30 years. Earl Green had been in the cabinet business that long, but Mr. Corpuz had not been in the construction business that long.

109. Erica Garza a/k/a Erika Novak was also present at Mrs. Barnette's first meeting with Mr. Corpuz. Erica Garza is Mr. Corpuz' cousin. She worked as a designer, including with the Barnettes. Robin Corpuz disputed the accuracy of Mrs. Garza's charges to Green & Sons, and of her record keeping.[21]

110. Exhibit O contains records concerning Barry and Michelle Barnette's construction project. The Barnettes' contract was signed August 2, 2017, and was to be completed by November 6, 2017, for the Barnettes to participate in a parade of homes event during the 2017 Christmas holidays. According to Defendants' records, more than a month passed before any work hours were billed to the Barnettes' project. [22]

111. The scope of work in the Barnettes' contract was not set forth in

---

[21] Ex. U.

[22] Ex. O, Pg. Corpuz-00076.

the contract, but in an attachment.  At trial the parties differed in their understanding of the scope of work and disagreed as to whether work performed was in or out of scope.  Mr. Corpuz likely failed to understand, or perhaps disregarded, what Mrs. Barnette wanted to do.  Mrs. Barnette was undoubtedly a challenging customer to satisfy.

112. Cost records for the Barnette project contain charges for cigarettes, pizza, gas, and tires.  Mr. Barnette testified that in his experience consumable items like this are not charged to customers on construction jobs.

113. Mr. Corpuz referred at trial to the Barnette project as a time and materials contract, meaning that work is directed by the customer.

114. During the project, Mr. and Mrs. Barnette asked for changes to the scope of work to be performed.[23]  The check and x marks on the list of changes admitted into evidence were made by the Barnettes.  Mrs. Corpuz corresponded with the Barnettes on October 26, 2017, regarding these changes.

115. Despite having concerns about Green & Sons' diligence in timely performing work, the Barnettes decided to move forward with the changes and made a correspond payment to do so.  Mrs. Barnette explained that this decision was because the Barnettes wanted their project finished in time for the Christmas season.  Because of the recent hurricane, there weren't many contractors available, and they worried that changing contractors would result in significant delays.  The Court found Mr. and Mrs. Barnettes' testimony on this point credible.

116. After changing the scope of work to be performed, the Barnettes paid an additional amount to Green & Sons on October 27, 2017.

117. Mr. Barnette, more than Mrs. Barnette, monitored progress on their construction project due to this professional background.

---

[23] *Id*. at Corpuz-00100.

118. Mr. Corpuz and the Barnettes disagreed extensively over the quality and pace of work. For example, Mrs. Barnette described improper removal of the pre-existing air conditioning unit in the Barnette's home, rendering it unusable and requiring replacement. Defendant testified it was moved properly to permit demolition to take place. According to Mrs. Barnette, a lack of air conditioning, given the climate in Southeast Texas, caused damage to hardwood flooring.

119. Mrs. Barnette testified she wanted antique black and white tile in an upstairs bathroom preserved, but the entirety of the tile was demolished by Green & Sons.

120. Mr. Corpuz and Mr. and Mrs. Barnette disagreed over the performance of plumbing work.

121. Mr. Corpuz and Mr. and Mrs. Barnette disagreed over the performance of electrical work. Mr. Corpuz denied any electrical work was performed for Mr. and Mrs. Barnette. Exhibit O admitted into evidence by Defendants contains at least one small bill from Ritter Lumber for electrical supplies. Mr. Corpuz testified these supplies were not used for electrical installation work, but to secure electrical wires during other demolition work.

122. Mr. Corpuz estimated at trial that approximately $10,000.00 was spent on materials and vendors for Barry and Michelle Barnette's construction project. This is significantly less than the stipulated amounts paid by Mr. and Mrs. Barnette—$23,000 on August 3, 2017 and $33,042.00 on October 27, 2017. Mr. and Mrs. Barnette paid these funds totaling $56,042.00, which the parties stipulated were construction trust funds for purposes of Tex. Prop. Code 162.001, et. seq.

123. Mrs. Corpuz testified that, to satisfy Mr. and Mrs. Barnette's concerns about their project, a payments and expenses report was prepared for them as of October 26, 2017.[24] It is Mrs. Corpuz'

---

[24] Ex. O, Pg. 00078.

handwriting at the top of this document, noting that Mrs. and Mrs. Barnette wanted more and different payment and expense information. A revised payments and expenses report was provided to the Barnettes.[25]

124. Mrs. Barnette testified Mr. Corpuz would not return her calls.

125. Mr. Corpuz agreed the Barnettes' project was abandoned.

126. Photos of the Barnettes' project after its abandonment were admitted into evidence.[26]

127. The Barnettes would not have hired Green & Sons had they known their construction funds would be loaned to Arctex.

128. In her testimony, Mrs. Barnette's anger at disappointment at Green & Sons' failure to perform on the Barnettes' construction project was visibly apparent.

129. The Barnettes terminated Green & Sons because, according to Mr. Barnette, after three months only demolition work had been done.

130. After termination of the Barnettes' contract with Green & Sons, Mrs. Barnette hired Erika Garza on a limited basis despite her familial connection with Mr. Corpuz. [27]

131. It was from Erika Garza that Mrs. Barnette first learned Green & Sons had been loaning funds to Arctex.

132. The Barnettes never consented to any loan of their funds to Arctex.

133. Chris Borne is a licensed electrician and owner of Top Line Electric. He has known Mr. Corpuz since 1999 when they were in

---

[25] *Id.* at Pg. 00077.

[26] Ex. Barnette 9.

[27] Ex. Barnette 8.

an apprenticeship program together.

134. Mr. Borne testified concerning the upstairs bathroom portion of the Barnettes' project.  He had no knowledge of the scope of work on the Barnettes' project before he was hired with respect to their upstairs bathroom.

135. Mr. Borne stated that electrical work had been performed improperly in the Barnettes' upstairs bathroom, which he discovered only after removing sheetrock.  Faulty work included inaccessible junction boxes, and use of existing wiring in such a way as to create the possibility of an overload.

136. Mr. Borne re-wired the Barnettes' upstairs bathroom with all new wiring at a cost of $2,000.00.[28]

137. Winston Droddy testified that most work done at the Barnettes' project was demolition.  He stated, more credibly than Mr. Corpuz' denial of the fact, that electrical work was performed by Green & Sons in the Barnettes' upstairs bathroom.

138. Mr. Barnette agreed that most work was demolition and that electrical work was performed but stated that the electrical work was performed by Arctex.

139. Trial evidence and testimony indicated that the work performed at Green & Sons was of particularly poor quality.  Doubtless Mrs. Barnette was a difficult customer, and likely she and Mr. Corpuz did not communicate with one another clearly about what was expected.  Yet, this is no excuse for accepting construction funds from a customer, loaning them to another company without that customer's knowledge or consent, and then failing to perform on the project for which funds were accepted.

140. Evidence admitted reflected that to finish and/or repair their home after Green & Sons abandoned their project, the Barnettes paid at

---

[28] Ex. Barnette 6.

least $24,050.00.[29]

*Stipulated Facts – As to Jaime and Kristi Abshire*

141.   On or about September 26, 2017, Plaintiffs, Jaime and Kristi Abshire entered into a written contract with Defendants through Green & Sons for home improvement services.

142.   The contract price for the Abshires' project was not to exceed $61,935.00, which Plaintiffs paid to Defendants $55,700.00.

143.   The period of the contract was September 26, 2017, through November 15, 2017.

144.   Green & Sons refunded Jaime and Kristi Abshire a total of $11,500.00.

*Facts Established at Trial – As to Jaime and Kristi Abshire*

145.   Jaime Abshire has an accounting degree.

146.   Exhibit T contains records concerning Jaime and Kristi Abshire's construction project.  Winston Snoddy signed the job contract for Green & Sons.

147.   Photos of Jaime and Kristi Abshire's home after construction were admitted into evidence.[30]

148.   Jaime Abshire testified that Green & Sons caused a significant water leak which he had to clean up, and that Green & Sons lost their kitchen cabinets.

149.   In November 2017, Mr. Corpuz did an in-person inventory of job progress at Jaime and Kristi Abshire's home but did not tell them Green & Sons was going out of business.

150.   Jaime and Kristi Abshire never cancelled their contract with Green &

---

[29] Ex. Barnette 6.

[30] Ex. J. Abshire 11.

Sons.  Instead, Green & Sons abandoned work on Jaime and Kristi Abshire's home without notice.

151. Jaime and Kristi Abshire lived in their home while it was under construction, and so were aware of job progress, or lack thereof.

152. To finish their home project, Jaime and Kristi Abshire hired a new general contractor, Proteus Logistics, LLC.  Proteus, in turn, employed some subcontractors.  Much work performed by Proteus was within the scope of work Mr. and Mrs. Abshire hired Green & Sons to perform.[31] The total work performed by Proteus, which was within the scope of work Mr. and Mrs. Abshire hired Green & Sons to perform, was $72,258.18.[32]

153. Some work performed by Proteus was not within the scope of work Green & Sons had originally been hired to perform.[33]

154. Jaime and Kristi Abshire suffered damages of $71,733.01 because of Green & Sons failures.[34]

   *Stipulated Facts – As to Cory and Jennie Mitchell*

155. Plaintiffs, Cory and Jennie Michell entered a written contract with Defendants through Green & Sons for home improvement services.

156. The contract price for the Mitchells' project totaled $97,490.70. The Plaintiffs paid Defendants $39,372.00.

---

[31] Ex. J. Abshire 10b, 10c, 10d, 10h, 10k, 10m, 10n, 10r, 10s, 10u, 10w, and 10z.

[32] This figure represents the sum of the invoices paid by Jaime and Kristi Abshire to finish their project which were admitted into evidence as Ex. J. Abshire 10b, 10c, 10d, 10h, 10k, 10m, 10n, 10r, 10s, 10u, 10w, and 10z.  Other invoices admitted, which testimony indicated were for work outside the scope of work Mr. and Mrs. Abshire hired Green & Sons to perform, are excluded from this total.

[33] Ex. J. Abshire 10a, 10e, 10f, 10g, 10i, 10j, 10L, 10o, 10p, 10q, 10t, 10v, 10x, 10y, 10z-aa, 10z-bb, 10z-cc, 10z-dd, and 10z-ee.

[34] Ex. J. Abshire 15.

157. The period of the contract was October 10, 2017, through November 20, 2017.

158. Green & Sons refunded Cory and Jennie Mitchell a total of $14,000.00.

   *Facts Established at Trial – As to Cory and Jennie Mitchell*

159. Corey Mitchell works for Exxon.

160. Mr. Corpuz testified he had no direct involvement in Mr. and Mrs. Mitchell's construction project.   Rather, Winston Snoddy and Brent Forsythe were supposed to track and manage materials and progress of the job.

161. Exhibit S contains records concerning Mr. and Mrs. Mitchell's construction project.  The accuracy of the job cost report for the Mitchells' construction project is doubtful.  For example, the cost report lists a charge of $1,224.00 for installation of sheetrock and insulation.[35] However, Mr. Mitchell testified credibly that he installed most sheetrock and insulation himself.

162. Winston Snoddy signed the job contract for Green & Sons.

163. Mr. Mitchell testified that the only items within Green & Sons' scope of work which was completed were some sheetrock.  The balance of the project he either completed himself or hired others to complete.

164. When no progress was made, Mr. Mitchell asked for status updates, but none were provided.  Mr. Mitchell testified he had to threaten employing an attorney to receive a return telephone call from Mr. Corpuz.

---

[35] Ex. S, Pg. 00313.

165. The Mitchells lived in a travel trailer while their home was under construction, including when work was not being performed. To complete their project, the Mitchells had to borrow funds from Mrs. Mitchell's parents.

166. Photos of the Mitchells construction project were admitted into evidence.[36] They reflect much work yet to be done.

167. Jennie Michell asked for a breakdown of costs and disbursements, but none was provided. She corresponded about this with Mrs. Corpuz.

168. Jennie Michell did not see any cost report until trial.

169. Mr. and Mrs. Mitchell cancelled their construction project on November 16, 2017. Mr. Corpuz testified he did not know the reason for cancelation.

170. Mr. Mitchell stated that cancelation of their contract had nothing to do with Mrs. Barnette's social media postings. Mrs. Mitchell agreed.

171. After terminating Green & Sons, the Mitchells hired Earl Green to finish their cabinets, which he did.

172. The Mitchells would not have hired Green & Sons had they known their construction funds were loaned or would be loaned to Arctex.

### *Stipulated Facts – As to Earl Green*

173. The stipulated value of Earl Green's home was $56,000.00. The stipulated value of Earl Green's rental property was $35,000.00.

174. Earl Green deeded his home to Johnathan Markuz Corpuz, Jr. on October 7, 2016. The conveyance of his home included the rental

---

[36] Ex. Mitchell 18.

property and a shop.[37]

*Facts Established at Trial – As to Earl Green*

175.  The circumstances of Earl Green's claim against Defendants are unique compared to the claims of other Plaintiffs.

176.  At trial, Earl Green testified he was 68 years old.  He used a walker to reach the witness box.

177.  In early 2015, Earl Green sold a piece of property which allowed him to pay off the remaining balance on the mortgage secured by his home.[38]  At the time he was experiencing health problems and wanted to make sure that he had a place to live if he needed to quit working.  Some of these health problems were caused by spider bites that affected his ability to work or supervise workers in his cabinet business.

178.  When he was working, Earl Green took one job at a time because he wanted to keep customers happy.  He testified that for him two jobs at one time would be a struggle.

179.  Earl Green described the condition of his home in 2015, describing repairs needed to include electrical work and repair to his sagging floor.  He stated that his workshop was a 30' x 60' structure which was originally a two-car garage. Part of the shop had a concrete floor, and part had a wood floor.  The rental property located on his homestead was unoccupied and needed some work, but Earl testified he had installed a new roof, had the home re-leveled, and that it did not need a complete remodel.  He believed the remodeling work done on the rental property later by Mr. Corpuz should have been at his home.

180.  Ostensibly to help Mr. Earl Green during his economic difficulties, Mr. Corpuz obtained a loan secured by Mr. Green's

[37] Ex. H.

[38] Ex. Green 9.

home to finance making improvements to it on Mr. Green's behalf.[39]  Mr. Corpuz stated improvements to Mr. Green's old shop could also be made to help him do more construction work and pay rent to Mr. Corpuz.

181.  Earl Green was, according to Mr. Corpuz, supposed to get his house back, but the rental home on Mr. Green's property was not part of their "deal."

182.  Earl Green understood what he agreed to differently. At trial he testified that he thought Mr. Corpuz would be added as an additional owner to his home, and that this was necessary to obtain a loan to remodeling his home.

183.  Earl Green cannot read well and is ill equipped to understand legal documents.  He trusted Mr. Corpuz due to their personal relationship.  At trial, when asked to read the deed he signed conveying his home to Mr. Corpuz, Mr. Green could not.

184.  Mr. Corpuz was in control of the proceeds of the loan secured by Earl Green's home.

185.  At trial, Mr. Corpuz produced a ledger which he testified shows how the proceeds from the loan secured by Mr. Green's house were utilized.[40]  This ledger reflects that some proceeds were used to make loan payments, some to pay Mr. Green, some to pay Winston Droddy, and some for materials and other purposes.  As an older man of limited means and with health challenges, why would Mr. Green sell his home to Mr. Corpuz, allow Mr. Corpuz as buyer to keep the sale proceeds, and receive little in return?  Why would Mr. Green need to be paid from loan proceeds secured by his own home?

186.  Evidence includes a Form 1099-MISC for 2017 sent by Green & Sons to Mr. Earl D. Green for non-employee compensation of

---

[39] Ex. Green 21.

[40] Ex. C.

27

$30,000.00.[41]  It does not appear to the Court Mr. Green was paid this amount during 2017.  For example, Defendants' own records of the disposition of loan proceeds reflect that *in total*, Mr. Green was paid $10,210.00, some of which was in 2016.[42]

187.  Most of the money for Mr. Green's home was used to build a shop on his property which was used by Green & Sons, or to improve the rent property.  Green & Sons hired employees to build cabinets in the shop on Mr. Green's property.  It appears to the Court much less work was performed on Mr. Green's home, despite Mr. Corpuz' stated intent.

188.  Before and after photos of the rental property were admitted into evidence.[43]

189.  Photos of Mr. Green's home, his old workshop, and the new shop building used by Green & Sons, were admitted into evidence.[44]

190.  The project at Mr. Green's home was not completed.  Mr. Corpuz testified this was because more work was needed than he anticipated.  Mr. Green apparently performed some of the work himself and was paid weekly for this work, but was not paid any profits.

191.  Mr. Corpuz asked Mr. Green to make loan payments in exchange for returning ownership of Mr. Green's home to Mr. Green.[45]

192.  Mr. Corpuz sought to evict Mr. Green from his home.[46]

---

[41] Ex. Q, Pg. 89.

[42] Ex. C; *see also* Ex. Q, Pg. 90-98.

[43] Ex. Q, Pg. 169-176.

[44] Ex. Q, Pg. 177-203.

[45] Ex. Green 14.

[46] Ex. Green 14, Green 15, and Green 16; *see also* Ex. Q, Pg. 143.

193.  Rather than return Mr. Green's home to him, Mr. Corpuz sold it to Luna Realty Investments, LLC, for $50,000.00.[47]  Mr. Green did not give Mr. Corpuz permission to do this, had no income, and no money.

194.  Luna Realty Investments, LLC, also attempted to evict Earl Green from his home. [48]

195.  Mr. Droddy testified that Green & Sons' first project was Mr. Green's home.  Mr. Droddy kept a spreadsheet of progress on the project at Mr. Green's home.[49]

196.  Mr. Droddy testified that Mr. Green's rental property was refurbished, his shop repaired, and a metal building constructed for Green & Sons.

197.  Mr. Droddy remembered Mr. Corpuz and Mr. Green arguing but stated he was not at the project at Mr. Green's house all the time.

198.  Mr. Green testified he has no knowledge about the finances of Green & Sons.  Rather, he was paid for work building cabinets from time to time on jobs of Green & Sons.[50]

199.  Earl Green did not give Mr. Corpuz permission to use his name and reputation in connection with Green & Sons, would never have attempted 36 simultaneous construction jobs, and testified that Mr. Corpuz is not qualified to do so either.

200.  Since the events in question, Earl Green suffered a broken hip, stopped working as a result, and now lives on Social Security.

---

[47] Ex. Q, Pg. 99-127.

[48] Ex. Green 18 and Green 19.

[49] Ex. C.

[50] Ex. Q, Pg. 90-98.

*The Bankruptcy Case*

201. Before a deposition in the preceding state court litigation, Mr. and Mrs. Corpuz filed their voluntary petition for Chapter 7 bankruptcy on November 27, 2023.[51]

202. Stephen J. Zayler (the "Trustee") was assigned as the Chapter 7 Trustee on June 2, 2022.[52]

203. Mr. and Mrs. Corpuz filed their Original Schedules, Chapter 7 Statement of Current Monthly Income Form 122A-1, and Statement of Financial Affairs with their voluntary petition on November 27, 2023.[53]

204. In their Original Schedules, Mr. and Mrs. Corpuz scheduled the following debts to Plaintiffs, all as contingent, liquidated, and disputed:

   a.   Estate of Audrey Abshire - $64,000.00 – Incurred 10/2/2017

   b.   Jaime Abshire - $18,500.00 – Incurred 2017

   c.   Lary Cornett - $4,000.00 – Incurred 2017

   d.   Michelle & Barry Barnette - $33,000.00 – Incurred 8/2/2017

   e.   Cory Mitchell - $17,900.00 – Incurred 2017

   f.   Earl Green - Unknown – Incurred 2017

205. The 341 Meeting of Creditors was held and concluded on 1/19/2024.

---

[51] Case No. 23-10471, ECF No. 1.

[52] Case No. 23-10471, ECF No. 5.

[53] Case No. 23-10471, ECF No. 1.

206. The deadline to object to discharge or dischargeability was March 19, 2024.

207. Amended Schedule E/F was filed on January 9, 2024.[54]

208. The Complaint in Adversary No. 24-1001 was filed on March 18, 2024, by Ricky Paul Abshire, as the Representative of the Estate of Audrey Abshire.[55]  The Complaint in Adversary No. 24-1001 asserted causes of action against Mr. and Mrs. Corpuz under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(4).[56]

209. The Complaint in Adversary No. 24-1002 was filed on March 19, 2024, by Barry Barnette and Michelle Barnette.[57]  The Complaint in Adversary No. 24-1002 asserted causes of action against Mr. and Mrs. Corpuz under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(4).[58]

210. The Complaint in Adversary No. 24-1003 was filed on March 19, 2024, by Earl Green, Cory Mitchell and Jennie Mitchell, Jaime Abshire and Kristi Abshire, and Larry Cornett.[59]  The Complaint in Adversary No. 24-1003 asserted causes of action against Mr. and Mrs. Corpuz under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(4).[60]

211. None of the Plaintiffs filed a proof of claim, because Mr. and Mrs. Corpuz' bankruptcy case was a no-asset case in which no property was available for distribution to creditors.

212. No summary judgment motions were filed.

---

[54] Case No. 23-10471, ECF No. 15.

[55] Adv. No. 24-1001, ECF No. 1.

[56] *Id.*

[57] Adv. No. 24-1002, ECF No. 1.

[58] *Id.*

[59] Adv. No. 24-1003, ECF No. 1.

[60] *Id.*

## II. <u>Conclusions of Law</u>

1.  The Court has jurisdiction to consider the adversary complaint in this proceeding pursuant to 28 U.S.C. §§ 1334 and 157.

2.  This Court has authority to enter a final judgment on all issues raised in this adversary proceeding since it statutorily constitutes a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(A), (I), and (J) and meets all constitutional standards for the proper exercise of full judicial power by this Court.

3.  All exceptions to discharge under 11 U.S.C. § 523 "must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start." *Hudson v. Raggio* (*In re Hudson*), 107 F.3d 355, 356 (5th Cir. 1997).  The Fifth Circuit, however, has ruled that there are limits to this assumption, particularly in reference to the exceptions under 11 U.S.C. § 523 in which the debtor has allegedly committed fraud. *Tummel v. Quinlivan* (*In re Quinlivan*), 434 F.3d 314, 318-319 (5th Cir. 2005).  Consequently, courts must balance a debtor's "fresh start" against protecting the victims of fraud. *Id.* at 319.

4.  A preponderance of the evidence standard applies to the determination of the dischargeability of a particular debt under § 523. *See Grogan v. Garner*, 498 U.S. 279, 287-88 (1991).

5.  To fulfill the statutory policy of providing a debtor with a "fresh start," the provisions of § 523(a) are construed liberally in favor of a debtor. *See FNFS, Ltd. v. Harwood* (*In re Harwood*), 637 F.3d 615, 619 (5th Cir. 2011) (citing *Hudson v. Raggio & Raggio, Inc.* (*In re Hudson*)*,* 107 F.3d 355, 356 (5th Cir. 1997)); *Lawrence v. Frost Bank* (*In re Lawrence*), No. 21-10103, 2022 U.S. App. LEXIS 886, 2022 WL 118966, at *1 (5th Cir. Jan. 12, 2022).

6.  However, "a debtor has no constitutional or fundamental right to a discharge," because the "Code limits the opportunity for a completely unencumbered new beginning to the honest but unfortunate debtor." *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991).

32

## 11 U.S.C. § 523(a)(2)(A)

7.      11 U.S.C. § 523(a)(2)(A) of the Bankruptcy Code provides that:

> …a discharge under §727 of this title does not discharge an individual debtor from any debt for money, property, or services, ... to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

8.      Section 523(a)(2)(A) encompasses similar but distinct causes of action. The Fifth Circuit has distinguished the elements of "actual fraud" from those involving "false pretenses and false representations." *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1291 (5th Cir. 1995) (overruled on other grounds by *Husky Intern. Electronics, Inc. v. Ritz*, 136 S.Ct. 1581 (2016)).[61]  The Supreme Court also views these as distinct causes of action.  *Husky*, 578 U.S. at 355 (stating Congress "did not intend 'actual fraud' to mean the same thing as 'false representations.'"); *see also Choi v. Tan*, No. 4:24-CV-342, 2025 U.S. Dist. LEXIS 58243, at *14 (E.D. Tex. 2025).

9.      The distinction as recognized by the Fifth Circuit is a chronological one, resting upon whether a debtor's representation is made with reference

---

[61] The effect of *Husky* can be explained as follows:

> On May 16, 2016, the United States Supreme Court issued *Husky Int'l Electronics, Inc. v. Ritz*, [578] U.S. [355], 136 S.Ct. 1581, 194 L. Ed. 2d 655 (2016) in which it clarified the standards for actual fraud. In *Husky*, the debtor transferred large sums of Chrysalis Manufacturing Corporation's money to other entities he controlled. A creditor of Chrysalis Manufacturing Corporation argued that these inter-company transfers constituted actual fraud under § 523(a)(2)(A). The Supreme Court agreed and held that actual fraud under § 523(a)(2)(A), "encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation." *Husky*, 136 S.Ct. at 1586. "To the extent that *In re Acosta*, *RecoverEdge*, and other prior Fifth Circuit cases required that a debtor make a representation in order for a debt to be nondischargeable under § 523(a)(2)(A), those cases are effectively overruled by the Supreme Court's decision in this case. *Husky*, 136 S.Ct. at 1586."
>
> *In re Pellerin*, Nos. 1100857EE, 1100121EE, 2017 Bankr. LEXIS 655, at *23-24 (Bankr. S.D. Miss. 2017).

to a future event as opposed to a representation regarding a past or existing fact. *Bank of Louisiana v. Bercier (In re Bercier)*, 934 F.2d 689, 692 (5th Cir. 1991) (overruled on other grounds by *Husky Intern. Electronics, Inc. v. Ritz*, 578 U.S. 355 (2016)).[62] ["In order…to be a false representation or false pretense under 523(a)(2), the false representations and false pretenses [must] encompass statements that falsely purport to depict current or past facts.  [A debtor's] promise…related to [a] future action [which does] not purport to depict current or past fact…therefore cannot be defined as a false representation or a false pretense"].

10.   This means that "[a] debtor's representation related to a future action does not satisfy § 523(a)(2)(A) for a false pretense or false representation unless, at the time the representation was made, the creditor can establish that the debtor had no intention of fulfilling the promise or representation." *In re Rosenburg*, No. 20-40753-MXM-7, 2022 WL 4085886, at *3 (Bankr. N.D. Tex. Sept. 6, 2022).

11.   Plaintiffs all seek to have debts allegedly owed by Mr. and Mrs. Corpuz excepted from discharge pursuant to the "false pretenses" or "false representation" provision in § 523(a)(2)(A), and under the "actual fraud" provision in § 523(a)(2)(A).

12.   The Court will analyze all three categories listed in § 523(a)(2)(A): false pretenses, false representations, and actual fraud.

13.   Prior to considering this question, however, the Court must first consider whether debts owed by Mr. and Mrs. Corpuz to Plaintiffs exist. *Simmons v. Simmons (In re Simmons)*, Nos. 23-10130, 24-1006, 2025 Bankr. LEXIS 1382, at *21 (Bankr. E.D. Tex. 2025).

---

[62]  As another bankruptcy court explained:

*Husky* made clear that no misrepresentation is necessary to establish an "actual fraud" under § 523(a)(2)(A) of the Bankruptcy Code. Courts in the Fifth Circuit continue to follow *Bercier's* requirement that a "false representation" under § 523(a)(2)(A) must relate to past or current facts. See, *e.g., In re Carter*, No. 17-35082, 2018 WL 6060391, at *23 (Bankr. S.D. Tex. Nov. 19, 2018); *In re Martin*, No. 15-41103, 2017 WL 1316928, at *10 (Bankr. E.D. Tex. Apr. 7, 2017).

14. "A bankruptcy court cannot declare a debt nondischargeable until the creditor establishes the existence and amount of that debt." *In re Avery*, 594 B.R. 655, 661 (Bankr. S.D. Miss. 2018); *see also In re Burg*, 641 B.R. 120, 131 (Bankr. S.D. Tex. 2022). As the Court in *Burg* explained, "debt" is a defined term meaning "liability on a claim" and "claim" is a defined term meaning a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured . . ." *In re Burg*, 641 B.R. at 131; 11 U.S.C. §§ 101(12) and 101(5).

15. The Court finds that the following Plaintiffs have established that Mr. and Mrs. Corpuz owe them a debt which may possibly be nondischargeable:

   a. Estate of Audrey Abshire - $37,022.70, calculated as follows:

      i. $64,066.70 = Total paid by Audrey Abshire to Green & Sons, plus:

      ii. $44,141.00 = Completion cost paid to Andy's Remodeling[63]

      iii. Less $71,185.00 = the Green & Sons contract price

   b. Jaime and Kristi Abshire - $54,773.18, calculated as follows:

      i. $55,700.00 = Total paid by Jaime and Kristi Abshire to Green & Sons, plus:

      ii. $72,258.18 = Completion costs paid by Jaime and Kristi Abshire in Green & Sons work scope[64]

      iii. Less $61,935.00 = the Green & Sons contract price

---

[63] *See* ¶ 74, *supra.*

[64] *See* ¶ 152, *supra.*

    iv.    Less \$11,250.00 = Refund to Jaime and Kristi Abshire

  c.  Barry and Michelle Barnette - \$70,840.24, calculated as follows:

    i.    \$56,042.00 = Total paid by Mr. and Mrs. Barnette to Green & Sons, plus:

    ii.    \$24,050.00 = Repair costs paid after abandonment[65]

    iii.    Less \$9,251.76 = Credit to Green & Sons agreed by the Barnettes, but not otherwise credibly supported by evidence[66]

  d.  Cory and Jennie Mitchell - \$15,372.00[67]

  e.  Earl Green - \$91,000.00 – Stipulated Value of Home and Rental Property.[68]

*False Pretenses and False Representation*

16. While "false pretenses" and "false representation" both involve intentional conduct intended to create and foster a false impression, the distinction is that a false representation involves an express statement, while a claim of false pretenses may be premised on misleading conduct without an explicit statement. *See Walker v. Davis* (*In re Davis*), 377 B.R. 827, 834 (Bankr. E.D. Tex. 2007); *Haney v. Copeland* (*In re Copeland*), 291 B.R. 740, 760 (Bankr. E.D. Tenn. 2003); *FNFS, Ltd. v. Harwood* (*In re Harwood*), 404 B.R. 366, 389 (Bankr. E.D. Tex. 2009).

17. To succeed under § 523(a)(2)(A), the creditor must prove an intent to deceive. *See Friendly Fin. Service - Eastgate v. Dorsey* (*In re Dorsey*), 505 F.3d 395, 399 (5th Cir. 2007).

---

[65] *See* ¶ 140, *supra.*

[66] Pl. Clos. Stmt., 8, ECF No. 62.

[67] Ex. Mitchell 2.

[68] *See* ¶ 173, *supra*; *see also* Green Ex. 1.  No evidence indicated that ownership of Mr. Green's home had been returned to him.

18. "To obtain a judgment that a debt is nondischargeable for false representations, the misrepresentations must have been: (1) knowing and fraudulent falsehoods, (2) describing past or current facts, (3) that were relied upon by the other party." *Jacobson v. Ormsby (In re Jacobson),* No. 06-51460, 2007 WL 2141961, at \*2 (5th Cir. July 26, 2007); *In re Rifai*, 604 B.R. 277, 308 (Bankr. S.D. Tex. 2019).

19. "To obtain a judgment that a debt is nondischargeable for false pretenses, the creditor must show that: (1) the debtor engaged in conduct 'wronging one in his property rights by dishonest methods or schemes [such as] deprivation of something of value by trick, deceit, chicane[ry] or overreaching;' (2) there was scienter or intent; (3) causation; and (4) damages." *In re Rifai*, 604 B.R. 277, 312 (Bankr. S.D. Tex. 2019) (quoting *Novartis Corp. v. Luppino (In re Luppino)*, 221 B.R. 693, 701-02 (Bankr. S.D.N.Y. 1998)).

20. "When deciding whether a creditor has satisfied the 'intent' prong of a 'false pretenses' dischargeability exception, the bankruptcy court must consider whether the circumstances, as viewed in the aggregate, present a picture of deceptive conduct by the debtor, indicating an intent to deceive his creditor." *In re Hurst*, 337 B.R. 125, 133 (Bankr. N.D. Tex. 2005).

21. "Intent to deceive is present if a debtor intends or has reason to expect a creditor to act, or to refrain from action, in reliance upon the debtor's misrepresentation; a result is intended if a debtor either acts with desire to cause it or acts believing that there is a substantial certainty that the result will follow from his conduct." *Id.*

22. A court may infer the requisite intent from a "reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation." *Gen. Elec. Capital Corp. v. Acosta (In re Acosta)*, 406 F.3d 367, 372 (5th Cir. 2005); *see also In re Miller*, 39 F.3d 301, 305 (11th Cir. 1994) (considering the totality of the circumstances to determine the debtor's intent).

*Ruling – As to Ricky Abshire for the Estate of Audrey Abshire*

23. Plaintiff, Ricky Abshire for the Estate of Audrey Abshire, has not sustained his burden of proof that the indebtedness owed to her by Defendants, Jonathan M. Corpuz, Jr. and Robin M. Corpuz, arose from false pretenses or false representations as contemplated by § 523(a)(2)(A).

*Ruling – As to Barry and Michelle Barnette*

24. Plaintiffs, Barry and Michelle Barnette, have not sustained their burden of proof that the indebtedness owed to them by Defendants, Jonathan M. Corpuz, Jr. and Robin M. Corpuz, arose from false pretenses or false representations as contemplated by § 523(a)(2)(A).

*Ruling – As to Jaime and Kristi Abshire*

25. Plaintiffs, Jaime and Kristi Abshire, have not sustained their burden of proof that the indebtedness owed to them by Defendants, Jonathan M. Corpuz, Jr. and Robin M. Corpuz, arose from false pretenses or false representations as contemplated by § 523(a)(2)(A).

*Ruling – As to Cory and Jennie Mitchell*

26. Plaintiffs, Cory and Jennie Mitchell, have not sustained their burden of proof that the indebtedness owed to them by Defendants, Jonathan M. Corpuz, Jr. and Robin M. Corpuz, arose from false pretenses or false representations as contemplated by § 523(a)(2)(A).

*Ruling – As to Earl Green*

27. Plaintiff, Earl Green, has not sustained his burden of proof that the indebtedness owed to him by Defendants, Jonathan M. Corpuz, Jr. and Robin M. Corpuz, arose from false pretenses or false representations as contemplated by § 523(a)(2)(A).

*Ruling – As to Larry Cornett*

28. Plaintiff, Larry Cornett, has not sustained his burden of proof that the indebtedness allegedly owed to him by Defendants, Jonathan M. Corpuz, Jr. and Robin M. Corpuz, arose from false pretenses or false representations contemplated by § 523(a)(2)(A).

*Actual Fraud*

29. To have a debt excepted from discharge pursuant to the "actual fraud" provision in § 523(a)(2)(A), an objecting creditor must prove that (1) the debtor made representations; (2) at the time they were made the debtor knew they were false; (3) the debtor made the representations with the intention and purpose to deceive the creditor; (4) the creditor justifiably relied on such representation; and (5) the creditor sustained losses as a proximate result of the representations. *Selenberg v. Bates* (*Matter of Selenberg*), 856 F.3d 393, 398 (5th Cir. 2017); *see also Gen. Elec. Capital Corp. v. Acosta* (*In re Acosta*), 406 F.3d 367, 372 (5th Cir. 2005).

30. Despite these elements of actual fraud, the Supreme Court has ruled that "[t]he term 'actual fraud' in § 523(a)(2)(A) encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation." *Husky Intern. Electronics, Inc. v. Ritz*, 578 U.S. 356, 359 (2016). Though it declined to adopt a definition of actual fraud for all times and circumstances, the Supreme Court did state that "'[a]ctual fraud' has two parts: actual and fraud." *Id.* at 360. For fraud to be actual, plaintiffs must make a showing of wrongful intent on the part of the defendant. *Id.* Specifically, the Supreme Court described this idea as follows:

> The word "actual" has a simple meaning in the context of common-law fraud: It denotes any fraud that "involv[es] moral turpitude or intentional wrong." *Neal v. Clark*, 95 U.S. 704, 709, 24 L.Ed. 586 (1878). "Actual" fraud stands in contrast to "implied" fraud or fraud "in law," which describe acts of deception that "may exist without the imputation of bad faith or immorality." *Ibid.* Thus, anything that counts as "fraud" and is done with wrongful intent is "actual fraud." *Id.*

31. This intent can be inferred from circumstantial evidence. *Caspers v. Van Horne* (*In re Van Horne*), 823 F.2d 1285, 1287–88 (8th Cir. 1987) (abrogated on other grounds). As with false pretenses or representations, reckless indifference to the truth can in some situations constitute a sufficient showing of wrongful intent to find

actual fraud. *See In re Miller*, 39 F.3d 301, 305 (11th Cir. 1994); *see also Farmers & Merchants State Bank v. Perry* (*In re Perry*), 448 B.R. 219, 226 (Bankr. N.D. Ohio 2011) ("'[W]illful blindness' does not provide a defense to an action brought under § 523(a)(2)(A) and may instead be used as a factor indicative of fraud."); *see also Mid-South Maint., Inc. v. Burk* (*In re Burk*), 583 B.R. 655, 667 (Bankr. N.D. Miss. 2018)("a debtor who recklessly disregards the truth has the requisite wrongful intent for his actions to constitute actual fraud.")

32.   To satisfy the required element of creditor reliance, Plaintiff must prove both actual reliance and justifiable reliance which are determined by two different standards. Actual reliance is the equivalent of causation-in-fact, which is defined as a substantial factor in determining the course of conduct that results in . . . loss." *AT&T Universal Card Services v. Mercer* (*In re Mercer*), 246 F.3d 391, 403 (5th Cir. 2001) (emphasis removed). This level of reliance "requires little of the creditor." *Id.* In the case of loan fraud, "an issuer usually will be able to establish actual reliance by showing it would not have approved the loan in the absence of debtor's promise." *Id.* at 411.

33.   Justifiable reliance, described as "an intermediate level of reliance," is a subjective standard that is more relaxed than the objective reasonable reliance standard. *Field v. Mans*, 516 U.S. 59, 74 (1995). Despite this, reasonableness is still a consideration because "the greater the distance between the reliance claimed and the limits of the reasonable, the greater the doubt about reliance in fact." *Id.* at 76. The promisee is not, however, required to investigate even if an investigation would reveal the falsity of the promisor's representation unless the falsity is "readily apparent or obvious or there are 'red flags' indicating such reliance is unwarranted." *In re Hurst*, 337 B.R. 125, 133-34 (Bankr. N.D. Tex. 2005).

34.   Finally, the creditor must establish that its loss sustained is the "proximate result" or legal cause of the debtor's representation. *State of Texas v. Am. Tobacco Co.*, 14 F. Supp. 2d 956, 967 (E.D. Tex. 1997). Proximate cause is "largely a question of foreseeability." *First Nat'l Bank of Omaha v. O'Brien (In re O'Brien)*, 555 B.R. 771, 782-783

40

(Bankr. D. Kan. 2016).  Reliance on the debtor's representation is a proximate cause of the creditor's loss "if the evidence shows that the loss was a reasonably foreseeable consequence of the plaintiff's reliance." *Am. Tobacco Co.*, 14 F. Supp. 2d at 967.

*Ruling – As to Ricky Abshire for the Estate of Audrey Abshire*

35.  Plaintiff, Ricky Abshire for the Estate of Audrey Abshire, has not sustained her burden of proof that the indebtedness owed to her by Defendants, Jonathan M. Corpuz, Jr. and Robin M. Corpuz, arose from actual fraud as contemplated by § 523(a)(2)(A).

*Ruling – As to Barry and Michelle Barnette*

36.  Plaintiffs, Barry and Michelle Barnette, have not sustained their burden of proof that the indebtedness owed to them by Defendants, Jonathan M. Corpuz, Jr. and Robin M. Corpuz, arose from actual fraud as contemplated by § 523(a)(2)(A).

*Ruling – As to Jaime and Kristi Abshire*

37.  Plaintiffs, Jaime and Kristi Abshire, have not sustained their burden of proof that the indebtedness owed to them by Defendants, Jonathan M. Corpuz, Jr. and Robin M. Corpuz, arose from actual fraud as contemplated by § 523(a)(2)(A).

*Ruling – As to Cory and Jennie Mitchell*

38.  Plaintiffs, Cory and Jennie Mitchell, have not sustained their burden of proof that the indebtedness owed to them by Defendants, Jonathan M. Corpuz, Jr. and Robin M. Corpuz, arose from actual fraud as contemplated by § 523(a)(2)(A).

*Ruling – As to Earl Green*

39.  The evidence shows that Mr. Corpuz represented that he would make repairs to Mr. Green's home using loan proceeds, that doing this was for Mr. Green's benefit, and that conveying his home to Mr. Corpuz would not cause Mr. Green to lose his home.  Evidence supports

41

concluding that Mr. Corpuz knew this was not to be the case, and that Mr. Green was poorly equipped to understand the risks involved in conveying his home to Mr. Corpuz.  Mr. Corpuz knew that Mr. Green could not fully read all the documents involved. Mr. Corpuz knew that Mr. Green had previously paid off his home to ensure he could stay and live there if not working.  Mr. Corpuz knew that Mr. Green was not then working.  And Mr. Corpuz knew Mr. Green could not repay the loan secured by his home, whether it was titled in the name of Mr. Corpuz or Mr. Green.

40.     Evidence does not credibly support concluding that Mr. Corpuz sought and accepted conveyance of Mr. Green's home from altruistic motives. Had he done so, loan proceeds secured by the home would have been spent on Mr. Green's home for his benefit, rather than being spent partially, if not mostly, to benefit Mr. Corpuz or Green & Sons.

41.     After Mr. Corpuz' financial circumstances became difficult, he attempted to evict Mr. Green and then sold the property to another company which also attempted to evict Mr. Green.  Whether this second attempt was successful is unclear from the evidence.  What is clear is that, but for the actions and choices of Mr. Corpuz, Mr. Green would still own his home free and clear of a mortgage, subject of course to payment of property taxes.

42.     Mr. Corpuz had the requisite intent to deceive when represented to Mr. Green that he would make repairs to Mr. Green's home using loan proceeds, that doing this was for Mr. Green's benefit, and that conveying his home to Mr. Corpuz would not cause Mr. Green to lose his home.  Mr. Corpuz knew, because of his personal relationship with Mr. Green, that Mr. Green would likely trust him and overlook the risks of conveying his home to Mr. Corpuz.

43.     Because of their relationship, Mr. Green's limited abilities, and Mr. Green's health challenges at the time, evidence supports finding that Mr. Green's reliance on Mr. Corpuz' representations was justifiable.

44.     Mr. Green suffered damages of not less than $91,000.00, the amount of his home which was taken from him.

45. Regarding Mrs. Corpuz, there are circumstances where "§ 523(a)(2)(A) can extend to liability for fraud that a debtor did not personally commit." *Kahkeshani v. Hann (In re Hann)*, No. 22-20407, 2023 U.S. App. LEXIS 27447, at *14 (5th Cir. 2023). The same can be true for liability under the false pretenses or false representations components of section 523(a)(2)(A). *Auction Credit Enters., LLC v. Desouza (In re Desouza)*, 659 B.R. 288, 298 (Bankr. E.D. Tex. 2024). This is because a debtor may, under applicable state law, be charged with vicarious liability for fraud warranting a finding of nondischargeability. *Bartenwerfer v. Buckley*, 598 U.S. 69, 143 S. Ct. 665, 670, 214 L. Ed. 2d 434 (2023). However, the rationale of *Bartenwerfer* is not unlimited and "[t]his Court [] understands *Bartenwerfer* to require the Court to find some form of partnership or agency under state law in order to hold Defendant responsible for the nondischargeable fraud of another under § 523(a)(2)(A)." *Auction Credit Enters., LLC*, 659 B.R. at 297. This requirement of the existence of a partnership or agency relationship under *Bartenwerfer* applies to the first three elements of actual fraud under section 523(a)(2)(A). *Id.* at 298. Thus, for a debtor to be liable for the actual fraud of another under section 523(a)(2)(A), the creditor needs to show that the agent or partner (1) made a representation; (2) which the person knew was false at the time it was made; and (3) which the person made with the intent and purpose to deceive the creditor." *Id.* In the absence of any of these required elements, or if under state law no partnership or agency relationship exists, then under *Bartenwerfer* a debtor is not responsible under § 523(a)(2)(A) for the actual fraud, false representations, or false pretenses of another.

46. Under Texas law, marriage alone is not sufficient to support a finding of agency or partnership as required. *Id.* at n.25.[69]

47. Mr. Green signed a deed conveying his home to *both* Mr. Corpuz *and* Mrs. Corpuz. Mr. Corpuz *and* Mrs. Corpuz *both* signed the loan documents with Five Point Credit Union. Incidentally, Five Point was the same credit union where Green & Sons accounts were located. Mrs. Corpuz testified she kept bookkeeping records and performed administrative tasks, and she took care of banking matters, payments,

---

[69] See Tex. Fam. Code § 3.201(c) ("A spouse does not act as an agent for the other spouse solely because of the marriage relationship.").

bills, payroll, receipts, and transfers. This includes with respect to the use of loan proceeds for purposes other than benefiting Mr. Green. It is not credible under the evidence to separate Mrs. Corpuz from the actions of Mr. Corpuz with respect to Mr. Green. Green & Sons was the sole proprietorship of both Defendants, working together, and it was Green & Sons which performed and was paid from loan proceeds for the work done at Mr. Green's house. This work included, of course, construction of a shop which was used by Green & Sons while it operated, i.e. by the Defendants.

48.  Plaintiff, Earl Green, has sustained his burden of proof that the indebtedness of $91,000.00 owed to him by Defendants, Jonathan M. Corpuz, Jr. and Robin M. Corpuz, arose from actual fraud as contemplated by § 523(a)(2)(A).

*Ruling – As to Larry Cornett*

49.  Plaintiff, Larry Cornett, has not sustained his burden of proof that the indebtedness allegedly owed to him by Defendants, Jonathan M. Corpuz, Jr. and Robin M. Corpuz, arose from actual fraud as contemplated by § 523(a)(2)(A).

**11 U.S.C. § 523(a)(4)**

50.  11 U.S.C. § 523(a)(4) of the Bankruptcy Code provides that:

> …a discharge under §727 of this title does not discharge an individual debtor from any debt for money, property, or services, … (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

51.  Plaintiffs have not clearly pleaded a cause of action for embezzlement or larceny under § 523(a)(4).[70] The Court understands their causes of

---

[70] "A bankruptcy court is generally confined to grant a Plaintiff only the relief requested in the operative complaint, except where Fed. R. Civ. P. 54(c) is applicable." *Simmons v. Simmons (In re Simmons)*, Nos. 23-10130, 24-1006, 2025 Bankr. LEXIS 1382, at *17 (Bankr. E.D. Tex. 2025). In practice ". . .Rule 54(c) means a bankruptcy court may grant relief not specifically requested in the operative complaint if that relief is justified by the pleadings, the evidence presented, and granting such relief does not prejudice the opposing

action to allege fraud or defalcation while acting in a fiduciary duty, specifically the fiduciary duty referenced in Tex. Prop. Code § 162.001, et. seq.[71]

52.  To succeed on a claim of breach of fiduciary duty under § 523(a)(4), Plaintiffs must first establish the existence of a fiduciary duty in accord with precedent. *In re Bhai*, 2017 WL 6541131, at \*7 (Bankr. E.D. Tex. Dec. 21, 2017). According to the Fifth Circuit "this discharge exception was intended to reach those debts incurred through abuses of fiduciary positions and through active misconduct whereby a debtor has deprived others of their property by criminal acts; both classes of conduct involve debts arising from the debtor's acquisition or use of property that is not the debtor's." *Miller v. J.D. Abrams Inc. (Matter of Miller)*, 156 F.3d 598, 602 (5th Cir. 1998), cert. denied, 526 U.S. 1016 (1999) (internal quotations omitted).

53.  Whether the actions of an individual were taken in a fiduciary capacity as contemplated by § 523(a)(4) is determined by federal law. *FNFS, Ltd. v. Harwood (In re Harwood)*, 637 F.3d 615, 620 (5th Cir. 2011). Fifth Circuit precedent describes the scope of a fiduciary under § 523(a)(4) as follows:

> [T]he concept of fiduciary under § 523(a)(4) is narrower than it is under general common law. Under § 523(a)(4), "fiduciary" is limited to instances involving express or technical trusts. The purported trustee's duties must, therefore, arise independent of any contractual obligation. The trustee's obligations, moreover, must have been imposed prior to, rather than by virtue of, any claimed misappropriation or wrong. Constructive trusts or trusts ex malificio thus also fall short of the requirements of § 523(a)(4).

*Texas Lottery Comm'n v. Tran (In re Tran)*, 151 F.3d 339, 342–43

---

party." *Id.* at \*19. Granting judgment on a cause of action for embezzlement or larceny not included in the operative complaints would prejudice Defendants under the circumstances of this proceeding, and so the Court declines to do so.

[71] This statute is commonly referred to as the Texas Construction Trust Fund Act, or the CTFA.

(5th Cir. 1998); *see also EBE, Inc. v. Wilhelms (In reWilhelms)*, Nos. 23-40053, 23-04023, 2025 Bankr. LEXIS 493, at *20 (Bankr. E.D. Tex. 2025).  It logically follows then that "state law is important in determining whether or not a trust obligation exists." *Gupta v. Eastern Idaho Tumor Institute, Inc. (In re Gupta)*, 394 F.3d 347, 350 (5th Cir. 2004).

54. The CTFA, Tex. Prop. Code § 162.001, et. seq., is a statute designed to ensure that subcontractors and materialmen are paid for construction work they perform, and that funds paid by property owners for construction work do not disappear.  *In re Brown*, No. 22-20023, 2022 WL 17254467, at *4 (Bankr. E.D. Tex. Nov. 28, 2022); *see also In re T.S.C. Seiber Services, L.C.*, 771 F.3d 246, 250 (5th Cir. 2014), quoting *Dealers Elec. Supply Co. v. Scroggins Const. Co.*, 292 S.W.3d 650, 658 (Tex. 2009).  As recited in *Brown,* the CTFA and the fiduciary duties it imposes were described by the District Court as follows:

> The Trust Fund Act "imposes fiduciary responsibilities on contractors to ensure that subcontractors, mechanics and materialmen are paid for work completed."  *In re Waterpoint Int'l LLC*, 330 F.3d 339, 345 (5th Cir. 2003); *accord Fidelity & Guar. Ins. Underwriters, Inc. v. Wells Fargo Bank, N.A.*, No. Civ. A. H–04–2833, 2006 WL 870683, at *9 (S.D. Tex. Mar. 31, 2006).  This provision was "enacted to serve as a special protection for subcontractors and materialmen in situations where contractors or their assignees refused to pay the subcontractor or materialman for labor and materials."  *In re Waterpoint Int'l LLC*, 330 F.3d at 345; *see McCoy v. Nelson Utils. Servs., Inc.*, 736 S.W.2d 160, 164 (Tex. App.—Tyler 1987, writ ref'd n.r.e.).
>
> Accordingly, construction payments constitute trust funds under Chapter 162 of the Texas Property Code if they are "made to a contractor or subcontractor or to an officer, director, or agent of a contractor or subcontractor, under a construction contract for the improvement of specific real

property in this state." Tex. Prop. Code Ann. § 162.001 (Vernon 1995 & Supp. 2005); *accord Argyle Mech., Inc. v. Unigus Steel, Inc.*, 156 S.W.3d 685, 687 (Tex. App.—Dallas 2005, no pet.); *Holladay v. CW & A, Inc.*, 60 S.W.3d 243, 246 (Tex. App.—Corpus Christi 2001, pet. denied). In such a situation, the "contractor, subcontractor, or owner or an officer, director, or agent of a contractor, subcontractor, or owner, who receives trust funds or who has control or direction of trust funds" serves as trustee. Tex. Prop. Code Ann. § 162.002 (Vernon 1995); *accord C & G, Inc. v. Jones*, 165 S.W.3d 450, 453 (Tex. App.—Dallas 2005, pet. denied); *Holladay*, 60 S.W.3d at 246. The artisan, laborer, mechanic, contractor, subcontractor, or materialman who labors or furnishes labor or material for the construction or repair of an improvement on specific real property located in Texas is the beneficiary of any trust funds paid or received in connection with the improvement. *See* Tex. Prop. Code Ann. § 162.003 (Vernon 1995 & Supp. 2005); *accord In re Waterpoint Int'l LLC*, 330 F.3d at 345.

*Taylor Pipeline Const., Inc. v. Directional Rd. Boring, Inc.*, 438 F. Supp. 2d 696, 714–15 (E.D. Tex. 2006). The CTFA "is a remedial statute that should be given a broad construction."' *In re T.S.C. Seiber Services, L.C.*, 771 at 250.

55. Violation of this trust duty can result in non-dischargeability under § 523(a)(4). *In re Nicholas*, 956 F.2d 110, 112-14 (5th Cir. 1992); *Swor v. Bartley Tex. Builders Hardware Inc. (In re Swor)*, 347 F. App'x 113, 116 (5th Cir. 2009).

56. "For the CTFA to be applicable under its own terms, there must be a trustee, a beneficiary, and trust funds. A trustee under the CTFA is 'a contractor, subcontractor, or owner or an officer, director, or agent of a contractor, subcontractor, or owner, who receives trust funds or who has control or direction of trust funds . . .' Tex. Prop. Code Ann. § 162.002." *In re Brown*, No. 22-20023, 2022 Bankr. LEXIS 3336, at *11 (Bankr. E.D. Tex. 2022).

47

57.   As to Plaintiffs, Ricky Abshire for the Estate of Audrey Abshire, Barry and Michelle Barnette, Jaime and Kristi Abshire, and Cory and Jennie Mitchell, the Debtor-Defendants, Mr. and Mrs. Corpuz acting through their sole proprietorship Green & Sons, were contractors and so are within the definition of a CTFA trustee.[72]

58.   Two categories of people are trust fund beneficiaries under the CTFA. The first includes any "artisan, laborer, mechanic, contractor, subcontractor, or materialman who labors or who furnishes labor or material for the construction or repair of an improvement on specific real property in this state is a beneficiary of any trust funds paid or received in connection with the improvement." Tex. Prop. Code § 162.003(a). The second category includes "a property owner [who] is a beneficiary of trust funds described by Section 162.001 in connection with a residential construction contract." Tex. Prop. Code § 162.003(b).

59.   None of the Plaintiffs are artisans, laborers, mechanics, contractors, subcontractors, or materialman who labored or furnished labor or material for the construction or repair of improvements to specific real property as contemplated by Tex. Prop. Code Ann. § 162.003(a).

60.   Plaintiffs, Ricky Abshire for the Estate of Audrey Abshire, Barry and Michelle Barnette, Jaime and Kristi Abshire, and Cory and Jennie Mitchell, were all property owners who contracted with Defendants through their sole proprietorship Green & Sons to perform construction work on their respective homes. The Plaintiffs are therefore beneficiaries under the CTFA.

61.   "Construction payments are trust funds under this chapter if the

---

[72] "Under Texas law, a sole proprietorship has no separate legal existence apart from the sole proprietor." *CU Lloyd's of Tex. v. Hatfield*, 126 S.W.3d 679, 684 (Tex. App.—Houston [14th Dist.] 2004, pet. denied), citing *Ideal Lease Serv., Inc. v. Amoco Prod. Co., Inc.*, 662 S.W.2d 951, 952 (Tex.1983). *See also Plastronics Socket Partners, Ltd. v. Dong Weon Hwang*, No. 2:18-cv-00014-JRG-RSP, 2019 WL 4392526, at *3 (E.D. Tex. June 17, 2019), report and recommendation adopted, No. 2:18-CV-00014-JRG-RSP, 2019 WL 2865079 (E.D. Tex. July 3, 2019).

payments are made to a contractor or subcontractor or to an officer, director, or agent of a contractor or subcontractor, under a construction contract for the improvement of specific real property in this state." Tex. Prop. Code § 162.001(a).

62.   All funds paid by Plaintiffs, Audrey Abshire, Barry and Michelle Barnette, Jaime and Kristi Abshire, and Cory and Jennie Mitchell, to Defendants through their sole proprietorship Green & Sons, were to perform construction work on their respective homes.  These payments were trust funds under the CTFA.

63.   The CTFA is applicable, and Defendants owed a fiduciary duty to Plaintiffs, Audrey Abshire, Barry and Michelle Barnette, Jaime and Kristi Abshire, and Cory and Jennie Mitchell.

64.   Tex. Prop. Code § 162.031(a) provides:

> "A trustee who, intentionally or knowingly or with intent to defraud, directly or indirectly retains, uses, disburses, or otherwise diverts trust funds without first fully paying all current or past due obligations incurred by the trustee to the beneficiaries of the trust funds, has misapplied the trust funds.

65.   "Thus, the trust charges the holder, acting in the role of a statutory trustee, with protecting and segregating the construction payments for the benefit of would-be trust beneficiaries. Such beneficiaries need do nothing to secure their respective interests." *Margolis v. Hensley (In re Hensley)*, Nos. 12-42785, 12-4180, 2014 Bankr. LEXIS 4213, at *24 (Bankr. E.D. Tex. 2014).

66.   Regarding the proof required for a finding of non-dischargeability for violation of the CTFA under the fiduciary duty component of § 523(a)(4), this Court has previously written:

> However, the assessment of civil liability under Texas law for a CTFA violation arising from a diversion of construction trust funds from its intended beneficiaries is not singularly sufficient to render such debt nondischargeable as a defalcation while

49

acting in a fiduciary capacity under § 523(a)(4) of the Bankruptcy Code. As the Fifth Circuit explained in *Coburn Co. of Beaumont v. Nicholas (In re Nicholas)*, 956 F.2d 110, 113 (5th Cir. 1992), the fiduciary relationship imposed by the CTFA is sufficient for the purposes of nondischargeability under §523(a)(4) only if the beneficiary-plaintiff can demonstrate the existence of wrongful conduct under the Act by the trustee-contractor.  Stated differently, the Circuit in *Nicholas* held that the Texas construction trust fund statute "only creates a fiduciary duty to the extent that activity is wrongful under the statute. For the purposes of § 523(a)(4), a fiduciary duty only arises if there is a simultaneous wrongful misapplication of funds."  Thus, a creditor seeking to use the Texas Construction Trust Fund Act to establish nondischargeability under the fiduciary subsection of § 523(a)(4) must not only show that the contractor intentionally, knowingly, or with intent to defraud diverted trust funds from its intended beneficiaries, but it necessarily also requires that creditor to negate the existence of the statutory affirmative defense regarding the trustee's use of the trust funds as a part of its case-in-chief.  In statutory parlance, the creditor seeking to establish § 523(a)(4) nondischargeability in this context must prove that the diverted funds were not used by the contractor "for actual expenses directly related to the construction," notwithstanding the anomaly that the applicable statute would place that evidentiary burden upon the contractor-trustee.

*Vrana v. Thornhill (In re Thornhill)*, Nos. 19-20005, 19-2001, 2019 Bankr. LEXIS 3052, at *20-21 (Bankr. E.D. Tex. 2019).

67.   Thus, each of the Plaintiffs must show not only that Mr. and Mrs. Corpuz, acting as Green & Sons, intentionally, knowingly, or with intent to defraud, diverted trust funds from beneficiaries, but also that the diverted funds were not used by Defendants for actual expenses directly related to the Plaintiffs' respective construction projects.

68.   The evidence is clear that Mr. and Mrs. Corpuz diverted funds paid

50

by Plaintiffs, Ricky Abshire for the Estate of Audrey Abshire, Barry and Michelle Barnette, Jaime and Kristi Abshire, and Cory and Jennie Mitchell, to Arctex through their sole proprietorship Green & Sons.  The evidence is clear that this was done intentionally and knowingly, that these Plaintiffs' construction projects were abandoned or not completed, and that the balance of funds paid by each of these Plaintiffs were not entirely refunded.

69.   Were these diverted funds, for purposes of § 523(a)(4), used by Defendants for actual expenses directly related to the Plaintiffs' respective construction projects?  If so, then under the above precedents the Plaintiffs' § 523(a)(4) claims fail.  If not, then Plaintiffs have met their burden.

70.   Much was made by Defendants at trial about the return of these diverted trust funds from Arctex to Green & Sons.  The Court found the testimony of Brian Melancon on this point credible.  Some funds were repaid before Green & Sons ceased doing business, while the remainder were repaid afterwards.  But no matter when funds were repaid by Arctex to Green & Sons, Plaintiffs' construction projects were not completed.  Some were abandoned.  Had the returned funds been used on actual expenses directly related to the Plaintiffs' respective construction projects, this would not have been the case.  By the time funds were returned, it was too late for Green & Sons.

71.   Nor does the Court find credible the accuracy of the cost accounting reports admitted by Defendants for the purpose of proving the use of these funds.  It is impossible for the Court to determine, and the Defendants could not credibly answer whether, trust funds were used on Plaintiffs' respective construction projects *once they were returned by Arctex.*  For that is question which matters most, because funds diverted to Arctex were of course not used on Plaintiffs' respective construction projects.  The only way the funds could be used on Plaintiffs' projects was if and after they were returned to Green & Sons.  There is little evidence to show that they were.

*Ruling – As to Ricky Abshire for the Estate of Audrey Abshire*

72.   Plaintiff, Ricky Abshire for the Estate of Audrey Abshire, has sustained his burden of proof that the indebtedness of $37,022.70 owed to her by Defendants, Jonathan M. Corpuz, Jr. and Robin M. Corpuz, arose from fraud or defalcation while acting in a fiduciary capacity as contemplated by § 523(a)(4).

*Ruling – As to Barry and Michelle Barnette*

73.   Plaintiffs, Barry and Michelle Barnette, have sustained their burden of proof that the indebtedness of $70,840.24 owed to them by Defendants, Jonathan M. Corpuz, Jr. and Robin M. Corpuz, arose from fraud or defalcation while acting in a fiduciary capacity as contemplated by § 523(a)(4).

*Ruling – As to Jaime and Kristi Abshire*

74.   Plaintiffs, Jaime and Kristi Abshire, have sustained their burden of proof that the indebtedness of $54,773.18 owed to them by Defendants, Jonathan M. Corpuz, Jr. and Robin M. Corpuz, arose from fraud or defalcation while acting in a fiduciary capacity as contemplated by § 523(a)(4).

*Ruling – As to Cory and Jennie Mitchell*

75.   Plaintiffs, Cory and Jennie Mitchell, have sustained their burden of proof that the indebtedness of $15,372.00 owed to them by Defendants, Jonathan M. Corpuz, Jr. and Robin M. Corpuz, arose from fraud or defalcation while acting in a fiduciary capacity as contemplated by § 523(a)(4).

*Ruling – As to Earl Green*

76.   Plaintiff, Earl Green, has not sustained his burden of proof that the indebtedness owed to him by Defendants, Jonathan M. Corpuz, Jr. and Robin M. Corpuz, arose from fraud or defalcation while acting in a fiduciary capacity as contemplated by § 523(a)(4).

*Ruling – As to Larry Cornett*

77.   Plaintiff, Larry Cornett, has not sustained his burden of proof that the indebtedness allegedly owed to him by Defendants, Jonathan M. Corpuz, Jr. and Robin M. Corpuz, arose from fraud or defalcation while acting in a fiduciary capacity as contemplated by § 523(a)(4).

## III.   Conclusion

*Conclusion – As to As to Ricky Abshire for the Estate of Audrey Abshire*

1.   Because the Court concludes that the indebtedness owed to Plaintiff, Ricky Abshire for the Estate of Audrey Abshire by Defendants, Jonathan M. Corpuz, Jr. and Robin M. Corpuz, did not arise from false pretenses or false representations of the Defendants, judgment must be rendered for Defendants under the false pretenses or false representations component of 11 U.S.C. § 523(a)(2)(A) as to Plaintiff, Plaintiff, Ricky Abshire for the Estate of Audrey Abshire.

2.   Because the Court concludes that the indebtedness owed to Plaintiff, Ricky Abshire for the Estate of Audrey Abshire by Defendants, Jonathan M. Corpuz, Jr. and Robin M. Corpuz, did not arise from actual fraud of the Defendants, judgment must be rendered for Defendants under the actual fraud component of 11 U.S.C. § 523(a)(2)(A) as to Plaintiff, Ricky Abshire for the Estate of Audrey Abshire.

3.   Because the Court concludes that the indebtedness of $37.022.70 owed to Plaintiff, Ricky Abshire for the Estate of Audrey Abshire by Defendants, Jonathan M. Corpuz, Jr. and Robin M. Corpuz, arises from Defendants' fraud or defalcation while acting in a fiduciary capacity, judgment must be rendered for Plaintiff, Ricky Abshire for the Estate of Audrey Abshire under the fiduciary capacity component of 11 U.S.C. § 523(a)(4) and the indebtedness of $37.022.70 rendered nondischargeable.

*Conclusion – As to Barry and Michelle Barnette*

4.   Because the Court concludes that the indebtedness owed to Plaintiffs, Barry and Michelle Barnette, did not arise from false pretenses or false

representations of the Defendants, judgment must be rendered for Defendants under the false pretenses or false representations component of 11 U.S.C. § 523(a)(2)(A) as to Plaintiffs, Barry and Michelle Barnette.

5.    Because the Court concludes that the indebtedness owed to Plaintiffs, Barry and Michelle Barnette, did not arise from actual fraud of the Defendants, judgment must be rendered for Defendants under the actual fraud component of 11 U.S.C. § 523(a)(2)(A) as to Plaintiffs, Barry and Michelle Barnette.

6.    Because the Court concludes that the indebtedness of $70,840.24 owed to Plaintiffs, Barry and Michelle Barnette by Defendants, Jonathan M. Corpuz, Jr. and Robin M. Corpuz, arises from Defendants' fraud or defalcation while acting in a fiduciary capacity, judgment must be rendered for Plaintiffs, Barry and Michelle Barnette under the fiduciary capacity component of 11 U.S.C. § 523(a)(4) and the indebtedness of $70,840.24 rendered nondischargeable.

### *Conclusion – As to Jaime and Kristi Abshire*

7.    Because the Court concludes that the indebtedness owed to Plaintiffs, Jaime and Kristi Abshire, did not arise from false pretenses or false representations of the Defendants, judgment must be rendered for Defendants under the false pretenses or false representations component of 11 U.S.C. § 523(a)(2)(A) as to Plaintiffs, Jaime and Kristi Abshire.

8.    Because the Court concludes that the indebtedness owed to Plaintiffs, Jaime and Kristi Abshire, did not arise from actual fraud of the Defendants, judgment must be rendered for Defendants under the actual fraud component of 11 U.S.C. § 523(a)(2)(A) as to Plaintiffs, Jaime and Kristi Abshire.

9.    Because the Court concludes that the indebtedness of $54,773.18 owed to Plaintiffs, Jaime and Kristi Abshire by Defendants, Jonathan M. Corpuz, Jr. and Robin M. Corpuz, arises from Defendants' fraud or defalcation while acting in a fiduciary capacity, judgment must be rendered for Plaintiffs, Jaime and Kristi Abshire under the fiduciary capacity component of 11 U.S.C. § 523(a)(4) and the indebtedness of $54,773.18 rendered nondischargeable.

*Conclusion – As to Cory and Jennie Mitchell*

10.  Because the Court concludes that the indebtedness owed to Plaintiffs, Cory and Jennie Mitchell, did not arise from false pretenses or false representations of the Defendants, judgment must be rendered for Defendants under the false pretenses or false representations component of 11 U.S.C. § 523(a)(2)(A) as to Plaintiffs, Cory and Jennie Mitchell.

11.  Because the Court concludes that the indebtedness owed to Plaintiffs, Cory and Jennie Mitchell, did not arise from actual fraud of the Defendants, judgment must be rendered for Defendants under the actual fraud component of 11 U.S.C. § 523(a)(2)(A) as to Plaintiffs, Cory and Jennie Mitchell.

12.  Because the Court concludes that the indebtedness of $15,372.00 owed to Plaintiffs, Cory and Jennie Mitchell by Defendants, Jonathan M. Corpuz, Jr. and Robin M. Corpuz, arises from Defendants' fraud or defalcation while acting in a fiduciary capacity, judgment must be rendered for Plaintiffs, Cory and Jennie Mitchell under the fiduciary capacity component of 11 U.S.C. § 523(a)(4) and the indebtedness of $15,372.00 rendered nondischargeable.

*Conclusion – As to Earl Green*

13.  Because the Court concludes that the indebtedness owed to Plaintiff, Earl Green, did not arise from false pretenses or false representations of the Defendants, Jonathan M. Corpuz, Jr. and Robin M. Corpuz, judgment must be rendered for Defendants under the false pretenses or false representations component of 11 U.S.C. § 523(a)(2)(A) as to Plaintiff, Earl Green.

14.  Because the Court concludes that the indebtedness of $91,000.00 owed to Plaintiff, Earl Green, arose from actual fraud of the Defendants, Jonathan M. Corpuz, Jr. and Robin M. Corpuz, judgment must be rendered for Plaintiff, Earl Green under the actual fraud component of 11 U.S.C. § 523(a)(2)(A) and the indebtedness of $91,000.00 rendered nondischargeable.

15.  Because the Court concludes that the indebtedness owed to Plaintiff, Earl Green, did not arise from Defendants' fraud or defalcation while

55

acting in a fiduciary capacity, judgment must be rendered for Defendants, Jonathan M. Corpuz, Jr. and Robin M. Corpuz, under the fiduciary capacity component of 11 U.S.C. § 523(a)(4) as to Plaintiff, Earl Green.

*Conclusion – As to Larry Cornett*

16. Because the Court concludes that the alleged indebtedness owed to Plaintiff, Larry Cornett by Defendants, Jonathan M. Corpuz, Jr. and Robin M. Corpuz, did not arise from false pretenses or false representations of the Defendants, judgment must be rendered for Defendants under the false pretenses or false representations component of 11 U.S.C. § 523(a)(2)(A) as to Plaintiff, Larry Cornett.

17. Because the Court concludes that the alleged indebtedness owed to Plaintiff, Larry Cornett by Defendants, Jonathan M. Corpuz, Jr. and Robin M. Corpuz, did not arise from actual fraud of the Defendants, judgment must be rendered for Defendants under the false pretenses or false representations component of 11 U.S.C. § 523(a)(2)(A) as to Plaintiff, Larry Cornett.

18. Because the Court concludes that the alleged indebtedness owed to Plaintiff, Larry Cornett, did not arise from Defendants' fraud or defalcation while acting in a fiduciary capacity, judgment must be rendered for Defendants under the fiduciary capacity component of 11 U.S.C. § 523(a)(4) as to Plaintiff, Larry Cornett.

*Separate Judgment*

19. To the extent any of these conclusions of law constitute findings of fact, the Court expressly adopts them as such.

20. An appropriate judgment shall be entered consistent with these findings and conclusions.

Signed on 3/16/2026

THE HONORABLE JOSHUA P. SEARCY
UNITED STATES BANKRUPTCY JUDGE

56